539 S.E.2d 757

### In re TAX ASSESSMENT AGAINST AMERICAN BITUMINOUS POWER PARTNERS, L.P.

No. 27377, 27378.

Supreme Court of Appeals of West Virginia.

Submitted June 13, 2000.

Decided July 12, 2000.

---

Darrell V. McGraw, Jr., Attorney General, Stephen Stockton, Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellant Joseph Palmer, State Tax Commissioner.

Frances C. Whiteman, Esq., Whiteman, Burdette & Radman, PLLC, Fairmont, West Virginia, Attorney for Appellant Marion County Commission.

Herschel H. Rose, Esq., Rose & Atkinson, Charleston, West Virginia, Attorney for Appellee American Bituminous Power Partners, L.P.

McGRAW, Justice:

In these consolidated cases, the Marion County Commission and Joseph M. Palmer, Tax Commissioner of the State of West Virginia ("Tax Commissioner"), appeal the June 28, 1999 final order of the Circuit Court of Marion County, which ruled in favor of appellee American Bituminous Power Partners, L.P. ("ABPP"), on its claim that the Tax Commissioner violated applicable law by failing to employ an "income approach" to determine the fair market value of ABPP's electric-generating facility for the 1996 tax year. ABPP contends, and the lower court found as a matter of law, that the income approach method of valuation is mandated by 110 W. Va.C.S.R. § 1P–2 (1991). We conclude that the regulation in question affords the Tax Commissioner discretion in selecting the appropriate methodology for calculating the value of ABPP's power plant. As a consequence, we reverse.

I.

BACKGROUND

ABPP completed construction of its Grant Town power plant in April 1993, at a total

cost in excess of $100 million. The facility produces electricity using on-site "gob," or coal-processing refuse, which is burned by utilization of an innovative fluidized-bed technology. ABPP is not a public utility, but rather an independent producer of electric power, which is sold to Monongahela Power Company under a long-term contract. It is presently uncontested that the power plant incurred operating losses of $54,563 and $1,657,437 in 1993 and 1994, respectively, and showed positive net operating revenues of $2,061,884 in 1995.

■ The State Department of Tax and Revenue ("Tax Department") determined the market value of ABPP's property for tax year 1996 after making two calculations: First, an income-approach [1] valuation was obtained using only the income data for 1995 (the only year in which the power plant had then shown positive net operating revenues), which yielded a valuation of $44,444,444.[2] The Tax Department official who performed the income-based calculation, Jeff Amburgy, later testified that he relied exclusively upon 1995 income data due to the fact that the facility was operational for only part of 1993, and because the power plant experienced anomalous startup and maintenance expenses in 1994. Accordingly, Amburgy stated that in his opinion the 1995 net operating income was a "good figure going into the future."

■ A second valuation was made utilizing a cost approach,[3] which produced a value of $45,409,310.[4] The Department subsequently appraised the property at the latter value, basing its valuation exclusively upon the cost approach. The income approach was appar-

ently rejected on the basis of the limited income history of ABPP's facility.

Pursuant to W. Va.Code § 11–3–24 (1979), ABPP protested the Tax Department's appraisal for the 1996 tax year before the Marion County Commission, sitting as the Board of Equalization and Review. Before the Commission, ABPP presented evidence intended to demonstrate that (1) the income approach was the most appropriate method for valuing the power plant; (2) that the Tax Department's income-approach calculation was flawed by failing to take into account data from all of the three previous years, and also because it included as income revenue that flowed into a so-called "tracking account," which ABPP maintains was effectively a loan under its contract with Monongahela Power; and (4) the cost-approach calculation failed to account for functional obsolescence, in that some of the fuel handling equipment installed at the plant could not be used at full capacity given limitations in the fuel being recovered at the facility. Taking into account these factors, ABPP's witnesses testified that the power plant should be valued at $36,664,228 under a cost approach, and $1,218,750 under an income approach. Although ABPP maintained that the income approach should be the exclusive means of appraising its property, it nevertheless posited that an even weighting of its own calculations would result in an overall valuation of $18,941,489. The Tax Department's witnesses disputed all of these contentions. ABPP's arguments were effectively rejected by the County Commission, although the appraised value

---

1. The income approach is defined as "the appraisal process of discounting an estimate of future income into an expression of present worth" 110 W. Va.C.S.R. § 1P–2.3.12. In other words, "[t]he income approach to value is based on the principle that something is worth what it will earn." *Appeal of Colonial Pipeline Co.,* 318, N.C. 224, 226, 318 N.C. 224, 347 S.E.2d 382, 383 (1986).

2. This calculation was in fact based upon an income estimate of $4,000,000 for 1995. The discrepancy between this number and the actual net operating revenue figure of $2,061,884 is attributable to the Tax Commissioner's inclusion of proceeds from a so-called "tracking account," which ABPP has asserted should be treated as

loan proceeds rather than income. The circuit court found that the Tax Commissioner's inclusion of these tracking-account funds in the income estimate was erroneous, and appellants now concede this error.

3. The cost approach is defined as "the appraisal process in which replacement cost of improvements, less all types of depreciation, is added to a land value in determining an estimate of the fair market value for improved real property." 110 W. Va.C.S.R. § 1P–2.3.4.

4. This aggregate figure included real property in the amount of $9,365,800, and personal property totaling $36,043,510.

was reduced by $500,000, which was apparently intended to be an average of the Tax Department's cost- and income-approach valuations.

ABPP appealed to the circuit court in March 1996 pursuant to W. Va.Code § 11–3–25 (1967), once more asserting that the actual value of its power plant should be appraised at $18,941,489. In June 1999, the circuit court ruled in favor of ABPP *in toto*, concluding that (1) the Tax Department was required by regulation to employ both the income and cost approaches to valuation; (2) ABPP had proven by clear and convincing evidence that the tracking account should not have been included as current revenue[5]; and (3) the Tax Department was required by regulation to use data from the preceding three years in calculating the income-approach valuation. It is from this order that the Tax Commissioner now appeals.

## II.

### STANDARD OF REVIEW

■ A taxpayer's initial avenue for relief from an allegedly erroneous property valuation lies with the county commission, sitting as a board of equalization and review. W. Va.Code § 11–3–24 (1979). The burden upon the taxpayer to demonstrate error with respect to the State's valuation is heavy in these adjudicative proceedings: " 'It is a general rule that valuations for taxation purposes fixed by an assessing officer are presumed to be correct. The burden of showing an assessment to be erroneous is, of course, upon the taxpayer, and proof of such fact must be clear.' Syl. pt. 7, *In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691 (1983)." Syl. pt. 1,

*Western Pocahontas Properties, Ltd. v. County Comm'n of Wetzel County*, 189 W.Va. 322, 431 S.E.2d 661 (1993). In challenging a tax valuation, "[t]he burden [of proof] clearly falls upon ... [the taxpayer] to demonstrate through clear and convincing evidence that the tax assessments were erroneous." *In re Maple Meadow Min. Co.*, 191 W.Va. 519, 523, 446 S.E.2d 912, 916 (1994); *see also Pocahontas Land*, 172 W.Va. at 61, 303 S.E.2d at 699 ("It is obvious that where a taxpayer protests his assessment before a board, he bears the burden of demonstrating by clear and convincing evidence that his assessment is erroneous."); syl. pt. 2, in part, *Western Pocahontas Properties, Ltd., supra* ("The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous.")

■ Upon receiving an adverse determination before the county commission, a taxpayer has a statutory right to judicial review before the circuit court. W. Va.Code § 11–3–25 (1967). The statute provides little in the way of guidance as to the scope of judicial review, although it does expressly limit review to the record made before the county commission. Given this limitation, we have previously indicated that review before the circuit court is confined to determining whether the challenged property valuation is supported by substantial evidence, *see Killen v. Logan County Comm'n*, 170 W.Va. 602, 295 S.E.2d 689 (1982),[6] or otherwise in contravention of any regulation, statute, or constitutional provision, *see In re Tax Assessments Against the Southern Land Co.*, 143 W.Va. 152, 100 S.E.2d 555 (1957), *overruled on other grounds, In re Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959).[7]

---

**5.** Again, the Tax Commissioner now concedes that the tracking account should not have been included in calculating the value of the power plant based upon the income approach.

**6.** The Court stated in *Killen* that "when the taxpayer has appeared before the Board of Equalization and Review, judicial review by the circuit court and by this Court will be limited. Assessments fixed by the assessor or by the Board of Equalization and Review will not be set aside if there is substantial evidence to support them." 170 W.Va. at 619 n. 27, 295 S.E.2d at 706 n. 27

(citation omitted). *See also* syl. pt. 3, *Western Pocahontas Properties, Ltd., supra* (" 'An assessment made by a board of review and equalization and approved by the circuit court will not be reversed when supported by substantial evidence unless plainly wrong.' ") (citation omitted).

**7.** In syllabus point two of *Southern Land*, we stated:

In a case involving the assessment of property for taxation purposes, which does not involve the violation of a statute governing the assessment of property, or a violation of a

As this Court's previous cases suggest, and as we have recognized in other contexts involving taxation, *e.g.*, *Frymier–Halloran v. Paige*, 193 W.Va. 687, 695, 458 S.E.2d 780, 788 (1995), judicial review of a decision of a board of equalization and review regarding a challenged tax assessment valuation is limited to roughly the same scope permitted under the West Virginia Administrative Procedures Act, W. Va.Code ch. 29A.[8] In such circumstances, a circuit court is primarily discharging an appellate function little different from that undertaken by this Court; consequently, our review of a circuit court's ruling in proceedings under § 11–3–25 is *de novo*. *Cf. Wheeling–Pittsburgh Steel Corp. v. Rowing*, 205 W.Va. 286, 293, 517 S.E.2d 763, 770 (1999).

■ Moreover, the sole question posed in this case is whether the Tax Commissioner contravened the requirements of 110 W. Va. C.S.R. § 1P–2 by failing to employ an income approach in appraising ABPP's power plant.[9] As this issue raises a question of law, we undertake plenary review. Syl. pt. 1, *Appalachian Power Company v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review."). *See also Shawnee Bank, Inc. v.*

*Paige*, 200 W.Va. 20, 22, 488 S.E.2d 20, 22 (1997).

## III.

### DISCUSSION

■ The Tax Commissioner is charged by law with the task of valuing all industrial property within the state. W. Va.Code § 11–1C–10(c). Pursuant to this responsibility, the Tax Commissioner promulgated title 110, series 1P of the West Virginia Code of State Rules in July 1991,[10] which· governs the methodologies to be utilized in valuing commercial and industrial properties for purposes of taxation.

In the area of property valuation, the Tax Commissioner, as well as county tax assessors, are fundamentally bound by statute to ascertain the "true and actual value" of all property. W. Va.Code § 11–3–1 (1977). Such value is defined as "the price for which such property would sell if voluntarily offered for sale by the owner thereof...." *Id.* The regulations adopted by the Tax Commissioner respecting the valuation of commercial and industrial property reflects this mandate:

> The appraised value (market value) of commercial and industrial real property is the price at or for which the property would sell if it was sold to a willing buyer by a willing seller in an arms-length transaction without either the buyer or the sell-

constitutional provision, or in which a question of the constitutionality of a statute is not involved, this Court will not set aside or disturb an assessment made by an assessor or the county ... [commission], acting as a board of equalization and review, where the assessment is supported by substantial evidence.

8. W. Va.Code § 29A–5–4(g) provides as follows:
> (g) The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because of the administrative findings, inferences, conclusions, decision or order are:
> (1) In violation of constitutional or statutory provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedures; or
> (4) Affected by other error of law; or

> (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

9. ABPP does not contend that there is any defect in the regulations in question. In fact, its arguments are predicated upon the regulation being valid and enforceable. Consequently, our focus in this case is exclusively upon whether the Tax Commissioner properly applied this regulation.

10. These regulations are largely a restatement of 110 W. Va.C.S.R. §§ 1–11.9 & 1–11.10 (1988). Series 1P was promulgated in accordance with the Fair and Equitable Property Valuation Act of 1990, W. Va.Code § 11–1C–1 to –11, and is intended to "provide context modifications of relevant parts of 110 [W. Va.] C.S.R. § 1." 110 W. Va.C.S.R. § 1P–1.1.

er being under any compulsion to buy or sell.

110 W. Va.C.S.R. § 1P–2.1.1.

To ascertain fair market value, series 1P prescribes various factors that must be considered in the appraisal process, including "[t]he income, if any, which the property actually produces and has produced within the next preceding three (3) years." 110 W. Va. C.S.R. § 1P–2.1.1.9. With respect to methodology, the regulation directs that "[i]n determining an estimate of fair market value, the Tax Commissioner will *consider* and *use where applicable,* three (3) generally accepted approaches to value: (A) cost, (B) income, and (C) market data." 110 W. Va.C.S.R. § 1P–2.2.1 (emphasis added).[11] Also, the regulation goes on to redundantly state that "[o]nce generated, the various estimates of value will be *considered* in arriving at a final value estimate." 110 W. Va. C.S.R. § 1P–2.5.3.2 (emphasis added).[12]

■ An administrative agency is, of course, obligated to "follow and apply its rules and regulations in existence at the time of agency action." *Appalachian Power,* 195 W.Va. at 583 n. 8, 466 S.E.2d at 434 n. 8. *See also* syl. pt. 1, *Powell v. Brown,* 160 W.Va. 723, 238 S.E.2d 220 (1977) ("[a]n administrative body must abide by the remedies and procedures it properly establishes to conduct its affairs."); syl. pt. 4, *Black v. State Consol. Public Retirement Bd.,* 202 W.Va. 511, 505 S.E.2d 430 (1998); *Burns v. Dials,* 180 W.Va. 623, 378 S.E.2d 665 (1989); syl. pt. 1, *Trimboli v. Board of Educ. of Wayne County,* 163 W.Va. 1, 254 S.E.2d 561 (1979). The circuit court concluded that "the literal meaning of [§ 1P–2.2.1] is that *all* three methods, except for those methods which are inapplicable, are to be used in conjunction with one another." (Emphasis in original.) Consequently, the lower court found as a matter of law that the

regulation in question requires the Tax Commissioner to use both the income and cost approaches in valuing ABPP's property.[13] We find that this interpretation and application of the Tax Commissioner's regulation is erroneous.

■ Our focus here is upon the meanings to be ascribed to the terms "consider" and "use." If possible, we must derive significance from the regulation's alternative use of these words, since " 'courts are not at liberty to construe any statute so as to deny effect to any part of its language[ ]' and '[i]ndeed, it is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word.' " *Houyoux v. Paige,* 206 W.Va. 357, 361, 524 S.E.2d 712, 716 (1999) (quoting *Bullman v. D & R Lumber Co.,* 195 W.Va. 129, 133, 464 S.E.2d 771, 775 (1995)) (alterations in original). *See also Keatley v. Mercer County Bd. of Educ.,* 200 W.Va. 487, 495, 490 S.E.2d 306, 314 (1997) ("It has been a traditional rule of statutory construction that 'the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning,' *State ex rel. Johnson v. Robinson,* 162 W.Va. 579, 582, 251 S.E.2d 505, 508 (1979)."). But, of course, we are first bound to give effect to the meaning of the words themselves. "In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners in General Group v. Hix,* 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds, Lee–Norse Co. v. Rutledge,* 170 W.Va. 162, 291 S.E.2d 477 (1982). *See also* syl. pt. 3, *Byrd v. Board of Educ. of Mercer Co.,* 196 W.Va. 1, 467 S.E.2d 142

---

11. Series 1P deals with real and personal property in separate subsections. The language of § 1P–2.2.1, which applies to the valuation of real property, is repeated without substantial alteration in a later subsection pertaining to personal property, 110 W. Va.C.S.R. § 1P–2.5.3.1. Thus, the same directive applies to both forms of property.

12. This provision pertains to the valuation of personal property. The regulation governing

personal property is worded in the permissive: "Once generated, the various estimates of value *may* be considered in determining a final value estimate...." 110 W. Va.C.S.R. § 1P–2.2.2 (emphasis added).

13. The parties agree that the market approach is not applicable in the present case, given the lack of any comparable sales.

(1995) (" 'Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use.' ") (citation omitted).

The term "consider" is defined as "to think carefully about, esp[ecially] in order to make a decision; contemplate; reflect on." *Random House Webster's Unabridged Dictionary* 434 (2d ed.1998). Conversely, the verb "use" is defined as "to employ for some purpose; put into service; make use of." *Id.* at 2097; *see also Black's Law Dictionary* 1541 (6th ed. 1990) ("To make use of; to convert to one's service; to employ; to avail oneself of; *to carry out a purpose or action by means of;* put into action or service; especially to attain an end.") (emphasis added). As employed in the regulation, these two words have wholly divergent meaning: The Tax Commissioner is required to "consider" the various approaches to valuation by contemplating the feasibility of utilizing each of the ascribed methods. On the other hand, these methods are to be "used" or actually employed only where "applicable."

■■■ Any ambiguity arising from this vague reference to the "applicability" of the various methods of valuation is erased by a broader reading of the regulation. " 'In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. [p]t. 2, *Smith v. State Workmen's Compensation Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. pt. 3, *State ex rel. Fetters v. Hott*, 173 W.Va. 502, 318 S.E.2d 446 (1984). When the regulation in question is read as a whole, it becomes clear that the Tax Commissioner has considerable discretion in choosing the applicable method of valuing a particular property. The regulation directs that

> [w]hen possible, the *most accurate form of appraisal* should be used, but because of the difficulty in obtaining necessary data from the taxpayer, or due to the lack of comparable commercial and/or industrial properties, choice between the alternative appraisal methods may be limited.

110 W. Va.C.S.R. § 1P–2.2.2 (emphasis added). This provision obviously gives the Tax Commissioner discretion in choosing the most reliable technique for appraising a particular property, and specifically contemplates situations such as exist here, where the data are insufficient to employ one or more of the designated valuation methods. Moreover, with respect to personal property, the regulation makes clear that the cost approach is most appropriate where, as in this case, the valuation involves machinery and equipment:

> [O]f the three (3) approaches to value, the cost approach may be most consistently applied to machinery, equipment, furniture, fixtures, and leasehold improvements because of the availability of data. The market approach is used less frequently, principally due to a lack of meaningful sales. The income approach is not normally used because of the difficulty in estimating future net benefits to be derived except in the case of certain kinds of leased equipment.

110 W. Va.C.S.R. § 1P–2.5.3.2. The Commissioner has consistently reiterated this pronouncement on several occasions. *See* Tax Department Administrative Notice 99–12 (Jan. 29, 1999) (noting that "the [income] approach has limited use in the appraisal of industrial machinery, equipment, furniture, fixtures, and leasehold improvements because of the difficulty in establishing future net benefits"); Tax Department Administrative Notice 95–13 (Jan. 30, 1995) (same).

■■■ Based upon our broad reading of the regulation, we hold that title 110, series 1P of the West Virginia Code of State Rules confers upon the State Tax Commissioner discretion in choosing and applying the most accurate method of appraising commercial and industrial properties. The exercise of such discretion will not be disturbed upon judicial review absent a showing of abuse of discretion. Because the circuit court in this case interpreted the regulation at issue as expressly mandating that the Tax Commissioner utilize a particular method of valuation, we conclude that the lower court com-

mitted reversible error.[14]

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Marion County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

---

**14.** The Tax Commissioner also assigns error with respect to the circuit court's conclusion that the Tax Department was required to "use" income data from the preceding three years (rather than the one year in which the facility had shown a positive net revenues) in calculating a value for ABPP's property under the income approach. The Tax Commissioner points to the language of the regulation in question, which states that "the appraisal shall *consider* … [t]he income, if any, which the property actually produces and has produced within the next preceding three (3) years." 110 W. Va.C.S.R. § 1P–2.1.1.9 (emphasis added). As we have already noted, the terms "consider" and "use" are not synonymous, and we therefore fail to discern any requirement that the Tax Department must necessarily employ such data in making its income-approach calculations. Rather, the regulation merely requires that some consideration be given to this data with respect to the possibility of employing it for the purpose of deriving an income-based valuation. Consequently, we also find that the circuit court erred in its interpretation of this rule.