728 S.E.2d 99

**CENTURY ALUMINUM OF WEST VIRGINIA, INC., Petitioner**

v.

**JACKSON COUNTY COMMISSION, and Craig A. Griffith, State Tax Commissioner of West Virginia, Respondents.**

No. 11–0590.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 2012.

Decided May 29, 2012.

John A. Mairs, Esq., Jackson Kelly PLLC, Charleston, WV, for Petitioner.

Darrell V. McGraw, Esq., Attorney General, L. Wayne Williams, Esq., Assistant Attorney General, Charleston, WV, for Respondents.

PER CURIAM:

This case is before the Court upon the appeal of the Petitioner, Century Aluminum of West Virginia, Inc. ("Century Aluminum"), from the November 17, 2010, Order of the Circuit Court of Jackson County, West Virginia, upholding the decision of the Jackson County Commission sitting as a Board of Equalization and Review ("Board of Equalization and Review") concerning the Respondent West Virginia State Tax Commissioner's (hereinafter referred to as the "Tax Department") 2010 appraisal of Century Aluminum's Ravenswood Aluminum Plant. Century Aluminum assigns as error the following: 1) the circuit court erred in upholding the Tax Department's policy of how it considers functional obsolescence and economic obsolescence for categories of assets other than machinery and equipment; and 2) the circuit court erred in ruling that the Tax Department's policy of artificially limiting its consideration of obsolescence to a fifty percent reduction in the case of machinery and equipment complied with the requirement that property be valued at fair market value.[1] Based upon a review of the

---

1. Century Aluminum also assigns as error: 1) the circuit court's finding that the Tax Department had accounted for physical deterioration, functional obsolescence and economic obsolescence, in valuing Petitioner's industrial real and personal property; and 2) the circuit court's affirming the Board of Equalization and Review's decision to make no change in the Tax Department's appraisal of the Ravenswood Plant. The Court finds that these arguments are redundant and, therefore, the Court has combined them into the two alleged errors discussed *infra* in the argument section of this opinion. *See Robertson v. B A Mullican Lumber & Mfg. Co.,* 208 W.Va. 1, 2 n. 1, 537 S.E.2d 317, 318 n. 1 (2000) (finding that five alleged errors raised by the appellant were redundant and combining the errors into two errors that were addressed by the Court).

record, the parties' briefs and oral arguments, and all other matters submitted before the Court, the Court affirms the circuit court's decision.

## I. Procedural Background

Century Aluminum filed its Industrial Business Property Return on or about October 26, 2009, for the 2010 tax year.[2] The "assessment date"[3] for the Ravenswood Plant was July 1, 2009. At issue in the instant appeal is Century Aluminum's challenges to the values regarding four categories of its industrial personal property: machinery and equipment; furniture and fixtures; computer equipment; and inventory.

According to the tax return filed by Century Aluminum, the "owner's values"[4] for the personal property that is the subject of this appeal[5] were:

| | |
|---|---|
| Machinery and Equipment | $50,860,998 |
| Furniture and Fixtures | 286,681 |
| Computer Equipment | 523,759 |
| Inventory | 18,281,665 |

The Tax Department, however, determined the appraised values[6] of Century Aluminum's industrial personal property to be as follows:

| | |
|---|---|
| Machinery and Equipment | $34,971,956[7] |
| Furniture and Fixtures | 312,687 |
| Computer Equipment | 533,540 |
| Inventory | 18,281,654 |

Century Aluminum objected to the valuations as determined by the Tax Department and filed a protest with the Board of Equalization and Review on February 9, 2010. A hearing occurred before the Board of Equalization and Review on February 13, 2010. Century Aluminum maintained that the Tax Department failed to take into account eco-

2. Century Aluminum owns an aluminum smelter plant located in Ravenswood, Jackson County, West Virginia. The Ravenswood Plant was constructed by Kaiser Aluminum and Chemical Company in the mid–1950's. Operations at the Ravenswood Plant were curtailed in February of 2009 and remain curtailed today.

3. "In the context of taxation of property and with reference to W. Va.Code 1931, 11–3–1, as amended, 'assessment date' means a particular day upon which ownership and value are to be ascertained for the purposes of allocation of liability for, and future levy of, property taxes." Syl. Pt. 1, *Moore v. Johnson Serv. Co.*, 158 W.Va. 808, 219 S.E.2d 315 (1975).

4. The term "owner's value" is not specifically defined within the tax return or the pertinent regulations; however, it appears from a review of the tax return that the owner's value contemplates the "true and actual value" of the property. Specifically, the tax return requires a signature of a corporate official. In this case, Mr. Scott Nord, Shared Services Manager for Century Aluminum, signed the return. By his signature, Mr. Nord affirmed

> that the information on this return, to the best of my knowledge and judgment, is true in all respects, that it contains a statement of all the real estate and personal property ... that the value affixed to such property is, in my opinion, its true and actual value, by which I mean the price at which it would sell if voluntarily offered for sale on such terms as are usually employed in selling such property....

5. The focus of the dispute between Century Aluminum and the Tax Department was the values placed on these four categories of industrial personal property by the Tax Department. Century Aluminum did not contest the valuation of the real property. To the extent that Century Aluminum references real property in its assignment of error, it does not argue any error relative to its real property and, therefore, it is waived. *See*

*Covington v. Smith*, 213 W.Va. 309, 317 n. 8, 582 S.E.2d 756, 764 n. 8 (2003) (stating that casual mention of an issue in a brief is insufficient to preserve the issue on appeal); *Tiernan v. Charleston Area Med. Ctr., Inc.*, 203 W.Va. 135, 140 n. 10, 506 S.E.2d 578, 583 n. 10 (1998) (finding that "[i]ssues not raised on appeal or merely mentioned in passing are deemed waived." (citation omitted)); *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) (finding that "'casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.'" (internal quotations and citation omitted)).

6. Pursuant to the provisions of West Virginia Code § 11–1C–10(c) (2008), "[t]he state Tax Commissioner shall value all industrial property in the State at fair market value...." *Id.* The appraised value, therefore, is the Tax Department's determination of the fair market value of the personal property at issue. The appraised value differs from the assessed value insofar as "assessed value" is defined by statute as "sixty percent of the market value of such item [of property] regardless of its class or species, except as hereinafter specifically provided in this article[.]" W. Va.Code § 11–1A–3(a) (2008).

7. As will be discussed in greater detail in the fact section of the opinion *infra*, the Tax Department originally calculated the value of the machinery and equipment under the cost approach to value at $69,943,902. That amount was then reduced by fifty percent to account for functional and economic obsolescence. Thus, the amount of $34,971,956 is the appraised value determined by the Tax Department under the cost approach to value and, therefore, is the fair market value as determined by the Tax Department. *See supra* note 6; *see also* W. Va.Code § 11–1C–10(c). Thus, the fair market value of the machinery and equipment as determined by the Tax Department was less than the fair market value reported by Century Aluminum.

nomic[8] or functional[9] obsolescence in determining the values given to furniture and fixtures, computer equipment, and inventory. Century Aluminum also contended that the Tax Department's fifty percent reduction in the value of its machinery and equipment for economic and functional obsolescence was arbitrary and the value of the machinery and equipment should have been reduced even more.

After the hearing, the Board of Equalization and Review sent a letter to Century Aluminum dated February 18, 2010, advising the company that it would not make any adjustment to the Tax Department's valuations. On March 19, 2010, Century Aluminum appealed the decision of the Board of Equalization and Review to the circuit court. On September 1, 2010, the circuit court held a hearing and the parties presented arguments regarding Century Aluminum's appeal. By Order entered November 17, 2010, the circuit court affirmed the decision of the Board of Equalization and Review.

## II. Standard of Review

■ This Court previously has held that " ' "[a]n assessment made by a board of review and equalization and approved by the circuit court will not be reversed when supported by substantial evidence unless plainly wrong." Syl. pt. 1, *West Penn Power Co. v. Board of Review and Equalization [of Brooke County]*, 112 W.Va. 442, 164 S.E. 862 (1932).' Syl. pt. 3, *Western Pocahontas Properties, Ltd. v. County Comm'n of Wetzel County*, 189 W.Va. 322, 431 S.E.2d 661 (1993)."

Syl. Pt. 4, *In re Petition of Maple Meadow Mining Co. for Relief from Real Prop. Assessment For the Tax Year 1992*, 191 W.Va. 519, 446 S.E.2d 912 (1994); *accord* Syl. Pt. 3, *In re Tax Assessment of Foster Found.'s Woodlands Ret. Cmty.*, 223 W.Va. 14, 672 S.E.2d 150 (2008). Further,

[g]enerally, a multifaceted standard of review is applicable to decisions of a circuit

court: "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed de novo." Syl. pt. 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996). *Accord* Syl. pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997) ("In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.").

*In re Tax Assessment of Foster Found.'s Woodlands Ret. Cmty.*, 223 W.Va. at 18–19, 672 S.E.2d at 154–55.

■ "As a general rule, there is a presumption that valuations for taxation purposes fixed by an assessor are correct. . . . The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous." Syl. Pt. 2, in part, *W. Pocahontas Props., Ltd. v. Cnty. Comm'n of Wetzel Cnty.*, 189 W.Va. 322, 431 S.E.2d 661 (1993); Syl. Pt. 8, *Bayer MaterialSci., LLC, v. State Tax Comm'r*, 223 W.Va. 38, 672 S.E.2d 174 (2008). When a taxpayer seeks relief from an allegedly erroneous property valuation,

[t]he burden upon the taxpayer to demonstrate error with respect to the State's valuation is heavy in these adjudicative proceedings: " 'It is a general rule that valuations for taxation purposes fixed by an assessing officer are presumed to be correct. The burden of showing an assessment to be erroneous is, of course, upon the taxpayer, and proof of such fact must

---

8. Economic obsolescence is defined as "a loss in value of property arising from 'Outside Forces' such as changes in use, legislation that restricts or impairs property rights, or changes in supply and demand relationships." W. Va.C.S.R. § 110–1P–2.3.5.

9. Functional obsolescence is defined as "[t]he loss of value due to facts such as excess capacity, changes in technology, flow of material, seasonal use, part-time use or other like factors. The inability to perform adequately the function for which an item was designed." W. Va.C.S.R. § 110–1P–2.3.8.

be clear.' Syl. pt. 7, *In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691 (1983)." Syl. pt. 1, *Western Pocahontas Properties, Ltd. v. County Comm'n of Wetzel County*, 189 W.Va. 322, 431 S.E.2d 661 (1993). In challenging a tax valuation, "[t]he burden [of proof] clearly falls upon … [the taxpayer] to demonstrate through clear and convincing evidence that the tax assessments were erroneous." *In re Maple Meadow Min. Co.*, 191 W.Va. 519, 523, 446 S.E.2d 912, 916 (1994); *see also Pocahontas Land*, 172 W.Va. at 61, 303 S.E.2d at 699 ("It is obvious that where a taxpayer protests his assessment before a board, he bears the burden of demonstrating by clear and convincing evidence that his assessment is erroneous."); syl. pt. 2, in part, *Western Pocahontas Properties, Ltd., supra* ("The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous.").

*In re Tax Assessment Against Am. Bituminous Power Partners, L.P.*, 208 W.Va. 250, 254–55, 539 S.E.2d 757, 761–62 (2000); *accord* Syl. Pt. 5, in part, *In re Tax Assessment of Foster Found.'s Woodlands Ret. Cmty.*, 223 W.Va. 14, 672 S.E.2d 150 (2008) ("A taxpayer challenging an assessor's tax assessment must prove by clear and convincing evidence that such tax assessment is erroneous."); *see also* Syl. Pt. 5, *Bayer MaterialSci.*, 223 W.Va. at 41, 672 S.E.2d at 177.

It is with the foregoing standards of review in mind that the Court undertakes review of the issues before it.

### III. Facts

The majority of the facts in this case are undisputed and were included in circuit court's thorough and detailed Order entered after it reviewed the evidence that was presented to the Board of Equalization and Review. The facts are focused upon Century Aluminum's challenges to the Tax Department's consideration of functional and economic obsolescence in its valuations.

### A. Machinery and Equipment

Regarding the first contested valuation of Century Aluminum's personal property, machinery and equipment, according to Century Aluminum's tax return, the "Owner's Value" for machinery and equipment was $50,860,998.[10] Cynthia Brown, Senior Appraiser in the Tax Department's Property Tax Division, testified that the Tax Department originally calculated the value of the machinery and equipment under the cost approach to value at $69,943,902. Ms. Brown testified that the Tax Department then reduced the value of the machinery and equipment by fifty percent to account for functional and economic obsolescence. Mr. Jeff Amburgey, Director of the Property Tax Division, testified that the fifty percent reduction for economic obsolescence was reached as follows:

> ever since I've been with the Tax Department, 50 percent would be the maximum that we would give to any facility when it was no longer in operation.
>
> In general, I think that probably began because you do an income approach based on the income that the facility is producing and in this case, it would have been zero because there's no production at all. So you've got an income value that is zero and a cost value that is something. If you average them, that's 50 percent of the cost and so I quite imagine that's where that came about.

Thus, the Tax Department's final appraised value of the machinery and equipment for the 2010 tax year was $34,971,956. The final appraised value, which is also the fair market value as determined by the Tax Department, of Century Aluminum's machinery and equipment was less than the fair market value placed on the machinery and equipment by Century Aluminum.

Century Aluminum, however, sought a further reduction of the value of the machinery and equipment, claiming that the Tax Department's fifty percent reduction in value for functional and economic obsolescence was artificial or arbitrary. In support of its position, Century Aluminum offered an appraisal by International Appraisal Company

**10.** *See supra* note 4.

("IAC"), a licensed appraisal organization specializing in the valuation of large industrial properties and process plants. Additionally, Mr. Joseph Kettell and Mr. Alexander Hazen, both of IAC, testified before the Board of Equalization and Review as these two individuals valued the Century Aluminum property under the income approach and the cost approach, respectively.

The circuit court made detailed findings regarding the methodologies used by both Mr. Kettell and Mr. Hazen in making their valuations under the income and cost approaches. Ultimately, the circuit court found that "Mr. Kettell valued the Century Aluminum plant at $14,100,000 under the income approach to value based on a discounted cash flow analysis." The circuit court also found that "Mr. Hazen calculated a weighted average of the valuations under the income approach to value and the cost approach to conclude that the plant should be valued at $16,000,000.

Significantly, regarding the fifty percent reduction in value for functional and economic obsolescence used by the Tax Department, Mr. Hazen, Century Aluminum's appraiser, testified that obsolescence can be calculated several different ways:

> When we're doing a plant like this, there's several ways you can go with an obsolescence analysis. Many appraisers just take an arbitrary percentage and say well, it's this percentage or that percentage but you're really better off trying to work out a number mathematically that can be done. This is what an investor would look at. They wouldn't look at, you know, I'm just going to knock off 6 percent or 20 percent or 80 percent. They're going to say here's my input; here's my cash flow; here's what I can afford to pay for the facility and get the return on investment that I need to have.

In the end, the circuit court determined that "Mr. Amburgey's approach was rather similar to the approach employed by Century Aluminum's expert appraiser, Mr. Hazen." Further, the circuit court found that

[w]hile Mr. Hazen expressed a clear preference for calculating obsolescence based upon an analysis of cash flow, he also stated that obsolescence can be calculated many different ways. In fact, Mr. Hazen admitted that many appraisers will apply obsolescence as an arbitrary percentage reduction in value.... However, the Tax Department's reduction was not arbitrary and represented the arithmetic average of the two different approaches to value.

Moreover, nothing in the record—from the IAC appraisal to the testimony of Mr. Kettell or Mr. Hazen—provided any explanation of how much of the final total of the plant that was derived from Century Aluminum's expert's utilization of the income and the cost approaches was allocated to machinery and equipment. Thus, the circuit court concluded that "[n]either expert witness for Century Aluminum satisfactorily explained how the final plant value was allocated to Machinery and Equipment. Century Aluminum simply allocated the value of $16,000,000 into $13,875,000 for Machinery and Equipment and the remainder to the real property for the sake of simplicity."

## B. Inventories

The circuit court noted that "[t]he Taxpayer argues that the Tax Department's valuation for Inventories [11] should be reduced by 59%[,]" to account for functional and economic obsolescence. (footnote added). The circuit court found, however, that

[c]ounsel for Century Aluminum represented to the Board of Equalization and Review that Century Aluminum did not show any impairment of value on the tax return and did not ask the Property Tax Division to reduce the value of the Inventories when the returns were filed. However, Century Aluminum believes the values should be reduced.

The circuit court then determined that

[t]he Tax Department valued the Inventory at the "Owner's Value" listed on the *ad valorem* property tax return filed by Century Aluminum. The Taxpayer has not

---

11. The circuit court found that the four elements of the inventories at issue were raw materials, goods in process, parts-owners's use, and supplies-owner's use.

argued that the Tax Department changed the values reported on the *ad valorem* tax return; at best, the Taxpayer has argued that it failed to note on the return that the inventories should be reduced in value since the aluminum was solidified in the processing pots. Nevertheless, the Tax Department accepted the Owner's Values as correct and used that Owner's Value in valuing Century Aluminum's industrial personal property.

Century Aluminum, however, maintains that it offered evidence to show that it did ask the Tax Department to reduce the values of its inventories to account for functional and economic obsolescence. A review of the evidence demonstrates that Century Aluminum offered the testimony of William Morgan, a chemical engineer who had worked in the aluminum reduction business and Mr. Ken Cooksey, a representative from INTAX,[12] who was at the hearing before the Board of Equalization and Review, but who was apparently [13] not formally called as a witness. Mr. Morgan testified about the state of the inventories and whether the inventories were usable upon the plant resuming operation. Mr. Morgan also testified that valuing the inventories was not in his area of expertise.

Century Aluminum also presented testimony from Mr. Cooksey, who was offered in an attempt to challenge whether Century Aluminum had requested a reduction in value of the inventories from the Tax Department. Mr. Cooksey remarked that he had met with Mr. Amburgey in his office a few weeks prior to the hearing before the Board of Equalization and Review in an attempt to settle the case. Mr. Cooksey stated that he told Mr. Amburgey that one of the inventories had been written down, but that "the three larger inventories have not been written down." [14] Mr. Amburgey, however, testified on behalf of the Tax Department that "[w]hen we met

with the taxpayer previously, I was led to believe that the inventory had already been written down. They'd already taken an impairment on the inventory and the impaired numbers were what were reported to the Tax Department and those numbers were the one[s] that we processed." The circuit court found that "[b]oth Mr. Cooksey and Mr. Amburgey speculated whether they had communicated clearly at the previous meeting." Again, there was no testimony offered by Century Aluminum regarding which elements of the inventories were reduced in value by it to account for obsolescence. Further, the IAC appraisal specifically did not include any valuations of Century Aluminum's inventories.

The circuit court found that "the Property Tax Division valued the inventories at the Owner's Value listed on the tax returns." The circuit court further found that "Mr Amburgey testified that the Property Tax Division operated under the belief that the inventory values on the *ad valorem* tax return had already been reduced to account for obsolescence." Consequently, the circuit court concluded that "[t]he testimony of Ms. Brown and Mr. Amburgey demonstrates that the Tax Department accounted for physical deterioration, functional obsolescence, and economic obsolescence, in valuing Century Aluminum's industrial personal property."

### C. Furniture, Fixtures and Computer Equipment

Century Aluminum also contested the Tax Department's consideration of functional and economic obsolescence in its valuation of furniture, fixtures and computer equipment. The circuit court found that "[t]he Tax Department valued the Furniture and Fixtures and Computer Equipment at the Owner's Value on the *ad valorem* property tax filed by Century Aluminum." The circuit court also found that "Mr. Amburgey testified that

**12.** There is nothing in the record which indicates what Mr. Cooksey did for INTAX or what type of company INTAX is.

**13.** Nothing in the record reflects the taking of an oath by Mr. Cooksey. Nor do his statements appear in the record in the standard format of most testimony with questions followed by an-

swers. However, these statements are referenced by the circuit court as "Mr. Cooksey, from Intax, testified for Century Aluminum."

**14.** Based upon the testimony, the phrase "written down" connotes subtracting an amount for depreciation or functional and economic obsolescence from the value of the inventories.

the Tax Department does not allow economic or functional obsolescence for Furniture and Fixtures and Computer Equipment[,]" however, just because the Tax Department did not allow a reduction in value for economic or functional obsolescence for furniture and fixtures, as well as computer equipment does not mean that they did not consider these types of depreciation in valuing the property.

As the circuit court determined,

[f]unctional obsolescence is not really warranted for office furniture and fixtures. More than half of the Furniture and Fixtures was purchased by Century Aluminum in 2008 and has been depreciated by 16% for the 2010 tax year. The Furniture and Fixtures purchased in 2001 have been depreciated down to 24 percent good and those purchased in 1999 and prior have been depreciated down to only 20 percent good.... A desk chair or a file cabinet still works well even though the desk chair or a file cabinet still works well even though the desk chair might be 11 years old. If a desk chair or filling cabinet is broken and does not work, then the taxpayer normally buys a new chair and throws away the broken chair. Furthermore, no deduction for obsolescence is warranted for the computer equipment. The Tax Department has already depreciated the computer equipment down to 18 percent good for all computers purchased in 2004 and earlier.

Accordingly, the circuit court concluded that "[t]he Tax Department has allowed physical deterioration for the Furniture and Fixture and the Computer Equipment.... Much of the Furniture and Fixtures and the Computer Equipment was purchased within the prior three years."

Based upon its review of the evidence and hearing before the Board of Equalization and Review, the circuit court determined that "[t]he values calculated by the Tax Department for Century Aluminum's industrial personal property ... [were] supported by sub-

stantial evidence in the record[,]" and that Century Aluminum failed to carry its burden of proof by demonstrating with clear and convincing evidence that the Tax Department's valuations were wrong. *See In re Tax Assessment Against Am. Bituminous Power Partners, L.P.*, 208 W.Va. at 254–55, 539 S.E.2d at 761–62. The Court, based upon its review of the record in this case, concludes that the factual findings made by the circuit court are supported by substantial evidence and are not clearly erroneous. *In re Tax Assessment of Foster Found.'s Woodlands Ret. Cmty.*, 223 W.Va. at 18–19, 672 S.E.2d at 154–55.

IV. Argument

A. Functional and Economic Obsolescence–Inventories, Furniture and Fixtures, and Computer Equipment.

Century Aluminum first argues that the Tax Department's appraisal of the Ravenswood Plant violated the requirements of West Virginia Code § 11–3–1 (2008)[15] and the legislative rules for appraising industrial property. This argument is predicated upon Century Aluminum's contention that the Tax Department's refusal to consider functional and economic obsolescence for categories of assets other than machinery and equipment resulted in an appraisal which was not the fair market value of the property. In contrast, the Tax Department argues that it considered functional obsolescence and economic obsolescence in valuing Century Aluminum's inventories, furniture and fixtures, and computer equipment.

West Virginia Code § 11–3–1 provides, in relevant part:

All property shall be assessed annually as of the first day of July at its *true and actual value*, that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon the terms as such property, the value of which is sought to be ascertained, is usually sold, and not the price which might

---

15. West Virginia Code § 11–3–1 was amended by the Legislature in 2010. The amendments do not impact the decision in this case.

be realized if the property were sold at a forced sale....

*Id.* (emphasis added). The Legislature has placed the responsibility for valuing all industrial property [16] with the State Tax Commissioner. W. Va.Code § 11–1C–10(c) (2008). "The state Tax Commissioner shall value all industrial property in the State at fair market value...." *Id.* According to West Virginia Code of State Rules § 110–1P–2.1.1,

> [t]he appraised value (market value) of commercial and industrial real property is the price at or for which the property would sell if it was sold to a willing buyer by a willing seller in an arms-length transaction without either the buyer or the seller being under any compulsion to buy or sell. In determining appraised value, primary consideration shall be given to the trends of price paid for like or similar property in the area or locality wherein such property is situated....

*Id.; see Kline v. McCloud,* 174 W.Va. 369, 326 S.E.2d 715 (1984)(determining "true and actual value" means fair market value or what property would sell for on open market).

According to provisions in the West Virginia Code of State Rules, the Tax Commissioner "will consider and use, where applicable, three (3) generally accepted approaches to value: (A) cost, (B) income, and (C) market data[ ]" to value property for appraisals. W. Va.C.S.R. § 110–1P–2.2.1. Further, when using the cost approach to value West Virginia Code of State Rules § 110–1P–2.2.1.1 provides that

> [t]o determine fair market value under this [cost] approach, replacement cost of the improvements is reduced by the amount of accrued depreciation and added to an estimated land value. In applying the cost approach, *the Tax Commissioner will consider three (3) types of depreciation: physical deterioration, functional obsolescence,*[17] *and economic obsolescence.*[18]

*Id.* (Emphasis added).

In *In re Tax Assessment Against American Bituminous Power Partners ("ABPP")*, ABPP challenged the Tax Commissioner's appraisal of its power plant based upon the cost approach to value the plant, instead of the income approach in the appraisal of the plant. 208 W.Va. at 252–53, 255, 539 S.E.2d at 759–60, 763. The Tax Department appraised the power plant using both the income and cost approaches to valuation; however, the Tax Department ultimately appraised the property at the valuation obtained under the cost approach and rejected the income approach because of the limited income history of the ABPP plant. *Id.* at 253, 539 S.E.2d at 760. The Marion County Commission, sitting as the Board of Equalization and Review, affirmed the Tax Department's appraisal methods. The circuit court, however, reversed, finding in favor of ABPP. *Id.* The circuit court found, in part, that the Tax Department was required to use both the income and cost approaches to valuation and that in using the income approach, the Tax Department had to use data from the preceding three years [19] in calculating the income approach valuation. *Id.*

At issue on appeal in the *ABPP* case was "whether the Tax Commissioner contravened the requirements of 110 W. Va.C.S.R. § 1P–2 by failing to employ an income approach in appraising ABPP's power plant." 208 W.Va. at 255, 539 S.E.2d at 762. In examining this issue, the Court reviewed several provisions of West Virginia Code of State Rules including West Virginia Code of State Rules § 110–1P–2.1.1.9 which prescribed various factors that must be considered in the appraisal process including "[t]he income, if any, which the property actual produces and has produced within the next preceding three (3) years." 208 W.Va. at 256, 539 S.E.2d at 763. In connection with using income as a factor, the Court also analyzed the provisions of West Virginia Code of State Rules § 110–1P–2.2.1, which provided that " '[i]n deter-

---

**16.** According to West Virginia Code § 11–1C–10(a), the term "industrial property" is defined as "real and personal property integrated as a functioning unit intended for the assembling, processing and manufacturing of finished or partially finished products." *Id.*

**17.** *See supra* note 9.

**18.** *See supra* note 8.

**19.** *In ABPP*, Jeff Amburgey testified on behalf of the Tax Department that "he relied exclusively upon 1995 income data due to the fact that the facility was operation for only part of 1993, and because the power plant experienced anomalous startup and maintenance expenses in 1994." 208 W.Va. at 253, 539 S.E.2d at 760.

mining an estimate of fair market value, the Tax Commissioner will *consider* and *use where applicable,* three (3) generally accepted approaches to value: (A) cost, (B) income, and (C) market data.' " 208 W.Va. at 256, 539 S.E.2d at 763. Finally, the Court examined the regulation which provided that " '[o]nce generated, the various estimates of value will be *considered* in arriving at a final value estimate.' 110 W. Va.C.S.R. § 1P–2.5.3.2 (emphasis added)". 208 W.Va. at 256, 539 S.E.2d at 763.

■ The Court in *ABPP* focused upon the term "consider" as it is used within the rules and found that 'consider' is defined as "to think carefully about, esp[ecially] in order to A make a decision; contemplate; reflect on." 208 W.Va. at 257, 539 S.E.2d at 764 (quoting *Random House Webster's Unabridged Dictionary* 434 (2d ed.1998)). The Court ultimately determined based upon the foregoing definition that "[t]he Tax Commissioner is required to 'consider' the various approaches to valuation by contemplating the feasibility of utilizing each of the ascribed methods. On the other hand, these methods are to be 'used' or actually employed only where 'applicable.' " 208 W.Va. at 257, 539 S.E.2d at 764. This Court ultimately held in syllabus point five that

> Title 110, Series 1P of the West Virginia Code of State Rules confers upon the State Tax Commissioner discretion in choosing and applying the most accurate method of appraising commercial and industrial properties. The exercise of such discretion will not be disturbed upon judicial review absent a showing of abuse of discretion.

208 W.Va. at 252, 539 S.E.2d at 759, Syl. Pt. 5. Thus, the Court reversed the circuit court, determining that the Tax Commissioner has discretion in choosing the most reliable means to appraise property and the decision will only be overturned upon an abuse of that discretion. *Id.* at 257–58, 539 S.E.2d at 764.

In the instant action, the Tax Department employed the cost approach to value Century Aluminum's machinery and equipment, which is the largest portion of industrial personal property. Based upon the Court's decision in *ABPP*, however, it is "clear that the Tax Commissioner has considerable discretion in

choosing the applicable method of valuing a particular property." 208 W.Va. at 257, 539 S.E.2d at 764.

The issue involving functional and economic obsolescence in this case turns on what is meant by the requirement in the West Virginia Code of State Rules § 110–1P–2.2.1.1 that the Tax Commissioner's "will consider" three types of depreciation: physical deterioration, functional obsolescence and economic obsolescence, in utilizing the cost approach to valuation. *See ABPP,* 208 W.Va. at 257, 539 S.E.2d at 764. The Court has previously held that "[a] cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute." Syl. Pt. 3, *Meadows v. Wal–Mart Stores, Inc.,* 207 W.Va. 203, 530 S.E.2d 676 (1999). Further, "[i]t is a well known rule of statutory construction that the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning." *State ex rel. Johnson v. Robinson,* 162 W.Va. 579, 582, 251 S.E.2d 505, 508 (1979).

■ This Court must examine the plain wording of the rule that requires the Tax Commissioner to "consider" three types of depreciation: physical deterioration, functional obsolescence and economic obsolescence in utilizing the cost approach. *See* W. Va.C.S.R. § 110–1P–2.2.1.1. As in *ABPP,* the term 'consider' is defined as "to think carefully about, esp[ecially] in order to make a decision; contemplate; reflect on." 208 W.Va. at 257, 539 S.E.2d at 764 (quoting *Random House Webster's Unabridged Dictionary* 434 (2d ed.1998)). Absent from the legislative rule requiring the Tax Commissioner to consider functional and economic obsolescence is any directive regarding how the Tax Commissioner must go about "considering" economic and functional obsolescence. *See* W. Va.C.S.R. § 110–1P–2.2.1.1. Moreover, West Virginia Code of State Rules § 110–1P–2.2.1.1 does not require the Tax Commissioner to make any adjustment to the valuations made regarding property because of physical deterioration, functional obsolescence and economic obsolescence. *See id.* Rather, all that is required of the Tax Commissioner in applying the cost approach to

valuation is that the Tax Commissioner will think about or contemplate three types of depreciation: physical deterioration, functional obsolescence, and economic obsolescence. *Id.*

A review of the record and testimony of representatives of the Tax Department before the Board of Equalization and Review demonstrates that the Tax Department did consider the three types of depreciation—physical deterioration, functional obsolescence, and economic obsolescence—in utilizing the cost approach to value Century Aluminum's Ravenswood Plant. There was testimony from both Mr. Amburgey and Ms. Brown regarding how they considered functional and economic obsolescence regarding the machinery and equipment, as well as office furniture and fixtures, computer equipment and inventories. Succinctly stated, there is a lack of substantial evidence to support Century Aluminum's argument that the Tax Department refused to consider functional and economic obsolescence for categories of assets other than machinery and equipment. It is apparent that Century Aluminum connotes the word "consider," as used in the rule, with requiring a corresponding reduction in value. Therefore, Century Aluminum maintains that because the Tax Department did not make a downward adjustment for functional and economic obsolescence to other assets, the Tax Department "refused" to consider functional and economic obsolescence. However, West Virginia Code of State Rules § 110–1P–2.2.1.1 does not require a reduction in value for functional or economic obsolescence under the cost approach. Having reviewed the record before the Court, Century Aluminum has failed to demonstrate by clear and convincing evidence that the Tax Department was wrong in its valuation of Century Aluminum's industrial personal property. *See ABPP,* 208 W.Va. at 254–55, 539 S.E.2d at 761–62. Neither has Century Aluminum shown that the circuit court's affirmation of the decision of the Board of Equalization and Review is plainly wrong. *See In re Petition of Maple Meadow Mining Co. for Relief from Real Prop. Assessment For the*

*Tax Year 1992,* 191 W.Va. at 520, 446 S.E.2d at 913, Syl. Pt. 4. Thus, the Court finds no merit to Century Aluminum's argument.

### B. Functional and Economic Obsolescence—Machinery and Equipment

Century Aluminum next argues that the circuit court erred in ruling that the Tax Department's policy of limiting its consideration of obsolescence to a fifty percent reduction in the case of machinery and equipment complied with the requirement that property be valued at fair market value as set forth in West Virginia Code § 11–3–1 and the applicable real and personal property regulations. Century Aluminum contends that the fifty percent limitation is artificial or arbitrary. Conversely, the Tax Department argues that the mathematical average of the income approach to value and the cost approach to value does not "artificially" limit obsolescence to a fifty percent reduction in value for machinery and equipment.

In valuing Century Aluminum's machinery and equipment, Ms. Brown testified that "we reduced the M & E (machinery and equipment) by 50 percent above and beyond the costs in their depreciation schedule." As previously noted, Mr. Amburgey testified that the fifty percent reduction for obsolescence was arrived at as follows:

> you do an income approach based on the income that the facility is producing and in this case, it would have been zero because there's no production at all. So you've got an income value that is zero and a cost value that is something. If you average them, that's 50 percent of the cost and so I quite imagine that's 50 percent of the cost and so I quite imagine that's where that came about. . . .
>
> If a company isn't—not making money or they're losing money, the value does not go below—generally speaking, the value does not go below 50 percent of the cost. So administratively we do not go below 50 percent cost and that's what we allowed this facility.

The only evidence offered by Century Aluminum regarding the fifty percent reduction

for obsolescence was from Mr. Hazen, Century Aluminum's appraiser, who testified that "there's several ways you can go with an obsolescence analysis. Many appraisers just take an arbitrary percentage and say, well, it's this percentage or that percentage but you're really better off trying to work out a number mathematically that can be done." Absent from either Mr. Hazen's or Mr. Kettell's testimony is any suggestion that that the Tax Department deviated from any standardized principles of appraising property in using a mathematically-derived fifty percent reduction in Century Aluminum's machinery and equipment to account for functional and economic obsolescence. Rather, Mr. Hazen merely opined that "you're really better off trying to work out a number mathematically that can be done [,]" for use in accounting for obsolescence which is exactly what the Tax Department did. Moreover, Mr. Hazen testified that obsolescence can be calculated in a variety of ways and he further stated that many appraisers will "take an arbitrary percentage" reduction in value.

Again, based upon discretion that is afforded the Tax Department in "choosing and applying the most accurate method of appraising commercial and industrial properties," this Court does not find error with the Tax Department's methods of valuing Century Aluminum's industrial personal property. *ABPP*, 208 W.Va. at 252, 539 S.E.2d at 759, Syl. Pt. 5, in part. The Court finds that the circuit court did not err it its determination that "[t]he Tax Department's decision to reduce the value of the Machinery and Equipment by fifty percent to account for obsolescence was neither arbitrary nor capricious. The reduction in value is supported by substantial evidence in the record."

### V. Conclusion

Based upon the foregoing, the decision of the Circuit Court of Jackson County is hereby affirmed.

Affirmed.

Chief Justice KETCHUM and Justice BENJAMIN dissent and reserve the right to file a separate opinion.

KETCHUM, C.J., dissenting:

I respectfully dissent because the Tax Commissioner did not follow his own appraisal regulations and policies. Specifically, the Commissioner did not: (1) properly consider the element of depreciation called "obsolescence" when valuing Century's inventory, and (2) arbitrarily placed a 50% cap on obsolescence when valuing Century's machinery and equipment. As a result, the Commissioner did not arrive at the property's "true and actual value" as required by *W.Va.Code*, 11–3–1.

The regulations governing the valuation of commercial and industrial real and personal property for *ad valorem* tax purposes are found in CSR § 110–1P–1, *et. seq.* In arriving at fair market value, the Tax Commissioner may use the cost, income, or market appraisal approach in establishing value. However, the cost approach is the preferred approach when valuing machinery, equipment, furniture, *etc.* CSR § 110–1P–2.5.3.2.[1]

In using the cost approach, the Commissioner is required to first determine the replacement cost of the item being appraised. The regulations next require that physical depreciation be deducted from replacement costs, as well as, two other types of depreciation called "function obsolescence" and "economic or external obsolescence." *See,* CSR § 110–1P–2.3.8. (functional obsolescence) and 2.3.5. (economic obsolescence) *See also, Tax Department's Administrative Notice,* 2010–13.

Physical depreciation is caused by use. Its deduction alone will not produce an accurate indication of market value. Tax appraisers must, and are required, to also consider loss in value due to obsolescence factors.

Functional obsolescence relates to inadequacies which render an item obsolete and concerns the inability of the item to satisfactorily perform the function for which the item was designed. This loss of value could be due, for example, to changes in technology.

On the other hand, economic obsolescence is the loss in value of property relating to external or outside forces. Relevant factors include power/energy availability and cost, and government oversight, such as pollution control constraints. The economic conditions specific to the industry constitute an additional factor.

Obsolescence at the Century plant was an important and necessary factor which should have been taken into account in the Tax Commissioner's appraisal of the inventory. The plant was closed and sitting idle due to economic conditions. There may have been no market for the plant's machinery and inventory in the United States.

Nevertheless, contrary to his own regulations, the Tax Commissioner failed to properly consider obsolescence in appraising Century's inventory. As a result, the Commissioner's evaluation was incomplete and arbitrary. Although the Commissioner has discretion in choosing the method of appraising commercial and industrial property, the method chosen must be the "most accurate." Syl. pt. 5, *In re: Tax Assessment Against American Bituminous Power Partners*, 208 W.Va. 250, 539 S.E.2d 757 (2000).

Moreover, the Tax Commissioner was arbitrary in placing a 50% obsolescence cap on the value of machinery and equipment. The machinery and equipment may have been worthless, but the Commissioner did not consider whether it had a 75% or 100% depreciated value due to obsolescence. The 50% cap applied to the machinery and equipment is not appraising; it was just a percentage pulled out of the air. Surely, every piece of Century's machinery and equipment did not depreciate at the same rate due to obsolescence.

The Tax Commissioner should be required to follow his regulations and perform an accurate appraisal. Accordingly, I respectfully dissent.

I am authorized to state that Justice BENJAMIN joins with me in this dissent.

---

1. CSR § 110–1P–2.5.3.2., states, in part, that, of the three approaches to value, "the cost approach may be most consistently applied to machinery, equipment, furniture, fixtures, and leasehold improvements because of the availability of data."